IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| **KENNETH DALE HOWE AND GWENDOLYN SUE HOWE** | * | **CIVIL ACTION NO. 05-0143** |
| | * | **JUDGE JAMES** |
| **VERSUS** | * | **MAGISTRATE JUDGE HAYES** |
| **JOHN E. HUGHES, WARD 2 CEMETERY ASSOCIATION, and MOREHOUSE PARISH POLICE JURY** | | |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion for Summary Judgment filed by defendants, John E. Hughes ("Hughes"), Ward 2 Cemetery Association ("Association"), and Morehouse Parish Police Jury ("MPPJ") (collectively "Defendants"). (Document No. 36). Plaintiff, Gwendolyn Sue Howe ("Plaintiff"), opposes the Defendants' motion.[1] (Document No. 41). The Defendants have filed a reply to Plaintiff's opposition. (Document No. 42). For reasons stated below, it is recommended that the motion be **GRANTED, and this matter be dismissed with prejudice.**

## BACKGROUND

This action arises out of Plaintiff's discharge from employment as the caretaker for the Association, a local cemetery association. According to Plaintiff, her discharge for suspected misappropriation of Association funds and the Association's refusal to afford her an opportunity to clear her name deprived her of due process guaranteed under the Fourteenth Amendment and constitutes defamation under state law. Defendants deny both of these claims and assert various forms of immunity.

The Association, a small political subdivision created by the MPPJ in 1980, was

---

[1] Kenneth Dale Howe ("Kenneth"), husband and original co-plaintiff of Plaintiff (collectively "Howes"), initially sought recovery under 28 U.S.C. § 1983 and state law. However, in a judgment dated September 6, 2005, the Court dismissed his section 1983 claim with prejudice and his state-law defamation claim without prejudice.

established for the sole purpose of maintaining six public cemeteries located in Ward 2 of Morehouse Parish. The Association consists of a five-member executive board, a secretary, and a caretaker.[2] Its powers include the ability to call tax elections, purchase materials, and contract for matters in its own name. Although the Association is a political subdivision, it is "fully responsible" to the MPPJ, which holds the Association's funds, pays its bills, and processes and maintains the employment paperwork for the Association's caretaker. Def.s' Exhibit A1. The caretaker is an at-will employee responsible for mowing the cemeteries' lawns, for disposing of burial flowers, and for the general upkeep of the cemeteries' grounds.

Plaintiff first became acquainted with the Association in 1998 when she and her family attempted, with some difficulty, to purchase a burial plot at one of the Association's cemeteries. Desiring to correct perceived problems in the Association's policies and administration, Plaintiff ran for and was elected president of the Association sometime between 2000 and 2001. As president, Plaintiff presided over the Association's regular public meetings, which often included discussions about the caretaker's responsibilities, purchases of materials, and maintenance projects. Occasionally, the Association would hold private executive meetings to discuss problems with the caretaker and other sensitive matters. During her term as president, the Association revised the caretaker's job description to include instructions on how purchases of materials and equipment were to be made, specifically that "purchases are supposed to require purchase orders from Alva Greer at [MPPJ]." Def.s' Exhibit A3.

Around January 2001, Plaintiff sought to replace the then current caretaker, Jamie Wallace, who did not have sufficient time to perform the job's duties. Plaintiff's position as Association president, however, created a conflict of interest, so Plaintiff resigned as Association

---

[2] During the time-period relevant to this suit, the Association consisted of the following: Hughes, Stephen Travis, Douglas Hughes, Roosevelt Jefferson, and Marie Jones, as members of the executive board; Ruby Wood, as secretary; and, of course, Plaintiff, as caretaker.

2

president on or about February 16, 2001, before she began working as the caretaker. As was customary with previous caretakers, Plaintiff enlisted the help of others, namely her husband, Kenneth, in performing the caretaker's duties. Because Kenneth was not an employee of the Association, he was required to complete a waiver and release prior to helping Plaintiff. At all relevant times, Plaintiff reported to the Association and its president, and although she was present at the Association's board's regular public meetings, she was excluded from the board's private executive meetings. If Plaintiff was unable to attend a regular meeting, she would obtain a copy of the minutes from the MPPJ.

     Plaintiff's tenure as caretaker remained uneventful until 2004. In January or February of 2004, while attempting to settle an unrelated dispute at one the Association's cemeteries, Hughes and Stephen Travis ("Travis"), the Association's vice-president, noticed a water hose and valve, which had not previously existed, within the cemetery's grounds. Worried that the Association would be charged for unauthorized water usage, and knowing that Kenneth was a member of the local water board, Hughes and Travis began investigating who had authorized the valve's installation. Their investigation included a review of an expenditure report detailing Plaintiff's purchases and activities. Hughes's Dep., 55/12-15. After reviewing this report and inquiring with several vendors, Hughes and Travis were concerned that Plaintiff and Kenneth Howe might have been improperly using Association funds to purchase fuel for personal use and to repair their personal equipment. At the Association's regular meeting on April 15, 2004, Hughes and Travis raised their concerns about the possible misappropriation; however, neither Plaintiff, who knew about the meeting, nor Kenneth Howe were present, and therefore they were unable to address the Association's concerns. Concluding that many of the expenses in the expenditure report were unauthorized, the board passed a motion providing that "any expense of cemetery maintenance must be brought to the Board President, if available, or to another member of the board." Def.s' Exhibit A7. Additionally, the Association noted that Kenneth, on his own, had

3

requested permission from the MPPJ to hire an additional helper. The Association concluded that Kenneth had no authority to hire additional helpers, and Travis made a motion for an amendment of the caretaker's job description to forbid any unauthorized employment of a sub-contractor or volunteer. In light of Plaintiff's absence from the meeting, the Association scheduled another meeting for April 22, 2004, and ordered a certified letter to be mailed to Plaintiff informing her that her presence at the meeting was mandatory. Plaintiff received the certified letter on April 17, 2004.

Shortly after receiving notice of the April 22 meeting, Plaintiff called Hughes to inquire about the meeting's purpose and her mandatory presence. Hughes declined to answer Plaintiff's questions, stating that "he was not at liberty to say." Pl.'s Dep., 64/10-11.[3]

Plaintiff, joined by her mother, Opal Owens, attended the meeting on April 22, 2004, which was held in the gymnasium of Beekman high school. After bringing the meeting to order, the executive board adjourned to a separate room with Plaintiff to conduct a private executive meeting. Hughes began by asking Plaintiff questions about the unauthorized water valve, including who had purchased it, and about the unauthorized use of additional helpers. Plaintiff initially responded to the questions, but soon became frustrated with Hughes and refused to answer any additional questions about other discrepancies. Specifically, Plaintiff described her actions as:

> And I told him, you know, I wasn't answering no more questions. I was not going to be cross-examined by him. And if they were going to fire me, to go ahead and fire me. And at that time we went -- I went back to get my mother --
> . . .
> I left the room. I left that room.

---

[3] Although Plaintiff testified that she reviewed the minutes of the regular meeting held on April 15, 2004, and presumably learned of the Association's concerns, it is unclear whether she did so prior to attending the executive meeting held on April 22, 2004. Pl.'s Dep., 65/18-25; 66/1-4.

Pl.'s Dep., 67/17-23. At that point, Hughes asked Plaintiff if she would be willing to sign a paper confirming that she was quitting, but Plaintiff refused. After Plaintiff walked out of the executive meeting, the Association reconvened in the gymnasium. Hughes immediately made a motion, which was seconded and carried, to discharge Plaintiff due to her refusal to cooperate with the board's inquiry into discrepancies surrounding her purchases. Hughes also stated that he was going to report the discrepancies to the district attorney's office the following morning.

On April 23, 2004, the day after the meeting, Plaintiff called Hughes, asked him not to report the discrepancies to the district attorney's office, and stated that "it could be worked out with us talking about it, not in a public meeting." Pl.'s Dep., 75/2-7. Hughes denied Plaintiff's requests. Later that morning, Hughes spoke with Assistant District Attorneys Charles Brumfield ("Brumfield") and Dion Young ("Young") about the discrepancies in Plaintiff's purchases. Brumfield and Young instructed Hughes to file a report with the Morehouse Parish Sheriff's Office ("MPSO"), which normally handled such matters. Following the district attorneys' instructions, Hughes filed a report with Lt. Keith Robertson ("Robertson") of the MPSO. Robertson forwarded Hughes's report to another MPSO officer, Lt. Terry Wyatt ("Wyatt"), who subsequently met with Hughes and the Howes.

Wyatt's report of his conversations with Hughes and the Howes details the alleged discrepancies and the Howes' defenses and justifications. Hughes provided Wyatt with two invoices for two trailer tires and a swivel trailer jack, totaling $202.50, and three invoices for parts and maintenance work on the Howes' personal equipment, totaling $88.73. According to Hughes, he suspected that the Howes were misappropriating Association funds because the tires and swivel jack listed on the invoices were not the same size or type used on the Association's trailer, and the repairs on the other invoices were made to equipment of a brand different from the Association's equipment. After inspecting Kenneth's trailer and discussing the matter with him, Wyatt noted that Kenneth had either admitted or attempted to justify the discrepancies that

5

Hughes reported. As for Hughes's report that Kenneth Howe had possibly purchased fuel for personal use, Wyatt reported that the Howes denied this claim, but that Hughes's source for this information, Melba Norsworthy ("Norsworthy"), maintained that she had witnessed Kenneth purchase the fuel. Wyatt forwarded his report to the District Attorney's office, which declined to prosecute the matter against the Howes "because the amount in controversy simply did not warrant a full-fledged prosecution." Def.s' Exhibits I, ¶6; L, Wyatt's Report.

On January 25, 2005, the Howes filed this action. Plaintiff claims that the Defendants deprived her of procedural due process rights by failing to provide her with an opportunity to clear her name with respect to the alleged discrepancies. She also claims that Hughes defamed her when he described, during the public meeting, the discrepancies related to her discharge and then reported them to the MPSO the following morning.

Defendants seek summary judgment on both claims. Defendants note that Plaintiff, an at-will employee, possessed no property interest in her employment and was not entitled to a hearing prior to her discharge. With respect to Plaintiff's right to a name-clearing hearing, the Defendants claim that she has failed to provide evidence that the publicized discrepancies were false or that she requested a name-clearing hearing, both essential elements of her claim. Hughes also asserts that he is entitled to qualified immunity for his actions as Association president. Finally, the Defendants claim that the Plaintiff's defamation claim fails because (1) Hughes's statements were truthful; (2) he is entitled to absolute immunity; and (3) his report to the MPSO was privileged in accordance with the doctrine of conditional privilege.

## LAW AND ANALYSIS

Summary Judgment Standard

Summary judgment is appropriate when the evidence before the Court shows that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. F.R.C.P. Rule 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An

6

issue is "genuine" under this standard if the non-moving party has presented sufficient evidence that a reasonable jury could return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden in summary judgment and must demonstrate through portions of the pleadings, depositions, answers to interrogatories, admissions and/or affidavits that no genuine issue of material fact exists. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has successfully demonstrated the absence of a genuine issue of material fact, the burden shifts to the non-moving party to show the opposite. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In doing so, the non-moving party may not merely rely on the allegations and conclusions contained within the pleadings; rather, he "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). Furthermore, these specific facts must be shown through something more than "some metaphysical doubt as to the material facts, by conclusory unsubstantiated allegations, or by a mere scintilla of evidence." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

<u>Section 1983 Claim</u>

A successful claim under section 1983 requires a showing that a person acting under color of state law deprived the plaintiff of rights secured by the Constitution or other federal laws. *See* 42 U.S.C. § 1983. The only disputed issue in Plaintiff's 1983 claim is whether Hughes, and by extension the Association and MPPJ, deprived Plaintiff of her "liberty interest which is protected by the due process clauses of the Fourteenth Amendment to the United States Constitution and Article I § 2 of the Louisiana Constitution of 1974."[4] Pl.'s Complaint, ¶ 11.

---

[4] The due process clause of the Louisiana Constitution, La. Const. art. I, § 2, is "coextensive" with that of the federal constitution, and provides "the same due process protection." *State v. Smith*, 24-514, p.6-7 (La. App. 2 Cir. 2/24/93); 614 So.2d 778, 780. Thus, the analysis of Plaintiff's state constitutional claim is subsumed under the analysis of her federal

There is no constitutionally protected general property or liberty interest in reputation.[5] *See Siegert v. Gilley*, 500 U.S. 226, 227 (1991); *Paul v. Davis*, 424 U.S. 693, 701 (1976); *Wells v. Hico Independent Sch. Dist.*, 736 F.2d 243, 256 (5th Cir. 1984). Where one is defamed or stigmatized in the course of his dismissal from public employment, however, he does have a cognizable liberty interest, which gives rise to certain procedural due process rights. *Codd v. Velger*, 429 U.S. 624, 628 (1978); *Paul*, 424 U.S. at 709; *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972). This interest arises from the detrimental effects the statements may have on an individual's ability to obtain future employment, not from their defamatory and stigmatizing nature alone. *See Roth*, 408 U.S. at 572-3. Accordingly, although an individual has no right to continued employment, due process requires that an individual be afforded the opportunity to refute the charges and clear his or her name. *See Codd*, 429 U.S. at 627; *Paul*, 424 U.S. at 710; *Roth*, 408 U.S. at 573; *Rosenstein v. City of Dallas*, 876 F.2d 392, 395 (5th Cir. 1989) (stating that individual is not entitled to challenge the termination decision), *rehearing granted and opinion reinstated in relevant part by*, 901 F.2d 61 (5th Cir. 1990).

---

constitutional claims.

[5] As it is undisputed that Plaintiff was an at-will employee of the Association, she possessed no property interest in her continued employment and therefore was not entitled to a pre-termination hearing. Those property interests which deserve due process protection are determined by state law or some other independent source. *Bishop v. Wood*, 426 U.S. 341, 344 (1976). "Absent a contractual agreement for employment for a specified term or a legislative or regulatory restraint on a public entity's termination authority, Louisiana law does not establish a right to continued employment." *Cabrol v. Youngsville*, 106 F.3d 101, 106 (5th Cir. 1997). At-will employment under Louisiana law is restricted only by various state and federal anti-discrimination statutes and laws governing the state's civil service system -- none of which apply here. *See* La. Civ. Code art. 2747; *Wallace v. Shreveport Mem. Library*, 97 F.3d 746, 747 (5th Cir. 1996). The cases Plaintiff cites to the contrary are inapposite because they involved employees who were either employed under contract or had some other reasonable expectation of continued employment, *see Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532 (1985); *Perry v. Sinderman*, 408 U.S. 593 (1972), or involved entirely unrelated matters. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) (trusts); *Hamilton v. Royal Int'l Petroleum Corp.*, 2005-846, 2006 WL 408540 (La. Feb. 22, 2006) (tax sale); *Driscoll v. Stucker*, 893 So.2d 32 (La. 2005) (denial of recommendation).

In *Rosenstein v. City of Dallas*, the United States Court of Appeals for the Fifth Circuit established a seven-part test for employees alleging that they were deprived a name-clearing hearing: the employee must prove (1) that he was discharged; (2) that defamatory charges were made against him in connection with the discharge; (3) that the charges were false; (4) that no meaningful public hearing was conducted pre-discharge; (5) that the charges were made public; (6) that he requested a hearing in which to clear his name; and (7) that the request was denied. 876 F.2d at 395-6. For purposes of this motion, the Defendants concede several elements of the *Rosenstein* test; however, they challenge Plaintiff's showing as to parts three, six, and seven of the test. Each of these parts will be considered below.

i. Truth or Falsity

In support of their position that the alleged defamatory remarks about the Plaintiff were true, Defendants cite to various admissions the Howes made in depositions and in conversations with Wyatt during his investigation. *See* Def.s' Ex. L; Plaintiff's Dep., 87/5-14 - 89/1-3; 98/20-25 - 99/1-10. In fact, the only allegedly defamatory remark which the Plaintiff did not admit to be true was the one concerning her husband Kenneth's alleged use of Association funds to purchase fuel for a personal vehicle. However, the remarks concerning Kenneth Howe were not defamatory to Plaintiff, and Kenneth Howe's defamation claim has been dismissed from these proceedings without prejudice. This court need not and should not make any determinations regarding the merits of his claim. As for the allegations involving the Plaintiff, the undisputed facts of this case show that the allegations were true and were therefore not defamatory.

ii. Hearing

The Defendants also claim that Plaintiff never requested a name-clearing hearing as required under the *Rosenstein* test. Plaintiff contends that she requested a hearing during her conversation with Hughes the morning after her termination. Specifically, she recounted the following during her deposition:

> I called Johnny Hughes the next morning after the meeting, and I asked him not to go to the D.A. . . . or to the police with that, that it could -- I don't know what they thought was wrong, but it could be worked out with us talking about it, not in a public meeting. And he said no; he was going.

Pl.s's Dep., 74/23-25 - 75/1-5. Accepting the Plaintiff's statement as true for purposes of this motion, it is insufficient to constitute a request for a name clearing hearing. The Plaintiff requested a **private** meeting to work out the problem, not a public hearing to clear her name. In other portions of her deposition testimony, Plaintiff admitted having failed to request a name-clearing hearing from the Association, MPPJ, or board member. *See id.* at 77/20-25 -78/1-18.

A review of the record shows that the only statement made by the plaintiff which could possibly be interpreted as a request for a hearing was apparently made to Wyatt during his investigation when the Howes denied having done anything wrong and expressed their desire to have their names cleared. This statement, while it could possibly be interpreted as a request for a hearing rather than simply a hope that the investigator's investigation would clear them, was not made to the Association, the MPPJ, or even a board member.

In *Rosenstein*, the Fifth Circuit addressed the requirement that an employee must have requested a name-clearing hearing. 876 F.2d at 396. Rosenstein, a probationary police officer with the Dallas Police Department, was publicly terminated for allegedly making several harassing and obscene telephone calls to a fellow female police officer. *Id.* at 394. Shortly after his termination, Rosenstein, in letter written to the Dallas City Manager, wrote "I was fired from the Dallas Police Department for something that I did not do," and requested "an appeal from this decision." *Id.* at 396. Finding that Rosenstein's letter sufficiently requested a name-clearing hearing, the court stated that "his request to participate in established grievance, appeals, or other review procedures to contest defamatory charges was sufficient to state a request for a name-clearing hearing" because "[a] discharged employee need not use the term 'name-clearing

hearing'"[6] *Id.*

Less than one year after *Rosenstein*, in *Howze v. City of Austin*, the Fifth Circuit revisited the requirement that an employee request a name-clearing hearing. 917 F.2d 208 (5th Cir. 1990). Again, the plaintiff employee had failed to explicitly mention that he sought a "name-clearing hearing." *Id.* Instead, shortly prior to being publicly discharged for fraudulent time cards, the employee had asked his supervisor: "Do I have any recourse?" *Id.* Holding that this statement could not reasonably be construed as a request for a name-clearing hearing, the court distinguished it from Rosenstein's statement based on its lack of a request to challenge the factual basis of the discharge and to have a public review of the decision. *Id.*

Thus, although an employee need not use the term "name-clearing hearing," he must phrase his request so that his employer is sufficiently apprised that the employee seeks to clear his name in a public forum. *See Howze*, 917 F.2d at 208 (finding employee's request failed to ask for "public review"); *Rosenstein*, 876 F.2d at 395 ("[T]he process due such an individual is merely a hearing providing a public forum or opportunity to clear one's name . . .") (citing *Roth*, 408 U.S. at 573 n. 12); *see also Quinn v. Shirey*, 293 F.3d 315, 324-5 (6th Cir. 2002) (finding employee's denial of charges and request for deferral of termination did not ask for "review through an established appeals process").

If the Plaintiff desired a name-clearing hearing, she could and should have expressed her desire to one of the Defendants. She did not do so. In addition, because she did not request a public hearing, clearly no such request could have been denied. Therefore, Plaintiff has failed to meet these two elements of the *Rosenstein* test.

For these reasons, it is recommended that the Defendants' motion for summary judgment

---

[6] The court went on to discuss how an employer could deny an employee's request for a formal appeal so long as it provided the employee with some other alternative procedure for clearing his name. *Id.*

with respect to Plaintiff's section 1983 claim be **GRANTED.**

Qualified Immunity

A public official or employee is entitled to qualified immunity for civil damages unless his conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because Plaintiff, as stated above, has failed to establish all the elements of the *Rosenstein* test, and therefore has failed to establish a constitutional violation, Hughes is clearly entitled to qualified immunity for his actions. *See Sanchez v. Swyden*, 139 F.3d 464, 466-7 (5th Cir. 1998) (describing qualified immunity as involving a two step inquiry: (1) whether the official's conduct violated a clearly established constitutional right and (2) whether the official's conduct was objectively reasonable). It is recommended that the defendant's motion be GRANTED on this basis as well.

State Law Defamation Claim

Plaintiff alleges two instances of defamation: (1) when Hughes explained during the public meeting on April 22, 2004, that the board was terminating her for her refusal to answer questions about discrepancies in her purchasing and hiring practices; and (2) when Hughes reported the discrepancies -- the unauthorized water valve, suspected purchases of fuel by Kenneth Howe for personal vehicles[7], and purchases of equipment and repairs for personal use -- to the district attorney's office and MPSO.

Under Louisiana law, claims of defamation require a plaintiff to prove five elements: (1) defamatory words; (2) publication; (3) falsity; (4) malice (actual or implied); and (5) resulting injury. *Cangelosi v. Schwegmann Brothers Giant Super Markets*, 390 So.2d 196, 198 (La.

---

[7] As was explained above, the statements regarding plaintiff's husband, Kenneth Howe, can not be used to support a defamation claim by Plaintiff. Even if they could support such a claim, the undersigned finds that Hughes was in good faith in reporting the allegations to the authorities and in requesting that the allegations be investigated and that the defense of qualified privilege would apply.

1980). "Language is defamatory when it tends to expose the plaintiff to contempt, hatred, ridicule or obloquy, or causes her to be shunned or avoided, or has a tendency to deprive her of the benefits of public confidence or injure her in her occupation." *Martin v. Lincoln General Hospital*, 22-894, p.10-11 (La. App. 2 Cir. 10/30/91); 588 So.2d 1329, 1332-3. Although defamatory words are normally a separate independent element, words that impute a crime to another are defamatory *per se;* proof of falsity and malice is not required, and the defendant has the burden of rebutting the presumption. *See id.*; *Carter v. Catfish Cabin*, 12-627, p. 9-10 (La. App. 2 Cir. 7/1/75); 316 So.2d 517, 521-2. Truth, however, remains a viable and absolute defense in a civil suit for defamation. *See* La. Rev. Stat. Ann. § 13:3602; *Brannan v. Wyeth Laboratories, Inc.*, 526 So.2d 1101, 1105 (La. 1988).

Given the finding by the undersigned that there is no genuine issue of material fact and that the statements made by the defendant regarding Plaintiff were true, it is recommended that the Defendants' motion for summary judgment on the Plaintiff's state law defamation claim be **GRANTED**

It should also be noted that, even if the ultimate truth of the statements made regarding the Plaintiff were in dispute, the Defendants would be entitled to summary judgment on the basis of qualified privilege. Even when a plaintiff proves all five elements of defamation, a defendant may be entitled to a qualified or conditional privilege if the defamatory statement "is made (a) in good faith, (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duty, (c) to a person having a corresponding interest or duty." *Elmer v. Coplin*, 17-600, p.12 (La. App. 2 Cir. 2/26/86), 485 So.2d 171, 176. From its elements, the purpose of this privilege is clear:

> [it permits] full and unrestricted communication concerning a matter in which the parties have an interest or duty, without inhibiting free communication in such instances by the fear that the communicating party will be held liable in damages if the good faith communication later turns out to be inaccurate.

13

*Aranyosi v. Delchamps, Inc.*, 98-1325, p. 10 (La. App. 1 Cir. 6/25/99), 739 So.2d 911, 916. The privilege's requirement of "good faith" means that the defamatory statement must be made with reasonable grounds for believing it to be true; however, the statement's ultimate truth is not required. *Hines v. Arkansas Louisiana Gas. Co.*, 24-051, p.30 (La. App. 2 Cir. 1/20/93), 613 So.2d 646, 656.

It is undisputed that Hughes and the officials at the district attorney's office and at MPSO had the requisite duty needed for qualified privilege to apply. Given the undisputed facts of this case, including the evidence of possible wrongdoing of which the defendants were aware, the Plaintiff's refusal to answer questions regarding the discrepancies, and her abrupt departure from the meeting, Hughes had reasonable grounds for believing the discrepancies warranted further investigation. Thus, Hughes acted in good faith in reporting those discrepancies to the proper authorities, and it is recommended in the alternative that the Defendants' motion for summary judgment on the basis of qualified privilege be **GRANTED**.

Conclusion

For the reasons stated above, it is recommended that the Defendants' motion for summary judgment with respect to Plaintiff's claims be **GRANTED, and that this matter be dismissed with prejudice at Plaintiff's cost**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

**FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 28th day of March, 2006.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE